IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Denise Presley,	Case No. 3:15 CV 67

          Plaintiff,	MEMORANDUM OPINION
 	AND ORDER

   -vs-

 	JUDGE JACK ZOUHARY

Ohio Department of Rehabilitation
  and Correction,

          Defendant.

### INTRODUCTION

Plaintiff Denise Presley sued her former employer, Defendant Ohio Department of Rehabilitation and Correction ("ODRC"), alleging race and sex discrimination. Specifically, she claims ODRC unfairly disciplined her, refused her a promotion, wrongly reassigned her, and constructively discharged her on the basis of her race and sex. Presley has abandoned her claims of hostile work environment and retaliation (*see* Doc. 31 at 1 n.1). Pending before this Court is ODRC's Motion for Summary Judgment (Doc. 25), Presley's Opposition (Doc. 27), and ODRC's Reply (Doc. 33).

### BACKGROUND

**Presley Begins Work at Toledo Correctional**

Presley, an African American nurse, began working for ODRC at the Toledo Correctional Institute ("TCI") in May 2012 (Doc. 22 at 23). Presley previously worked for the Ohio Department of Mental Health at a Toledo psychiatric hospital, but was terminated. Her union challenged the termination on her behalf, and the parties agreed to settle the grievance by transferring Presley to TCI

(*id.* at 22, 25). Presley's transfer to TCI included a one-year probationary period, rather than three-month probation, typical of other inter-agency transfers (*id.* at 34–35).

Presley received three weeks training in May and June 2012 (*id.* at 31). She was not paired with another nurse for on-the-job training when she started working at TCI, but by December she felt she received sufficient training to perform the duties of a nurse (*id.* at 41, 55). In her mid-year probation review, Presley received a rating of "often does not meet" in eight categories, including accurately administering medication (Doc. 22-6 at 1–4). The evaluation noted Presley routinely failed to properly complete patients' medication administration records, or "MARs" (*id.* at 4). This would become a common refrain. Presley noted on the evaluation her understanding that the review covered only her first six weeks at TCI, despite the fact that it was produced some seven months into her tenure (*id.* at 6).

Presley was written up and investigated periodically during her stint at TCI. In July 2013, Nurse Supervisor Laura Burkin gave Presley a counseling for mishandling a pill count (Doc. 22-18 at 1). A month later, Presley was investigated for tardiness and mishandling an inmate's medication (Doc. 22-24 at 1; Doc. 22-27 at 1). The former resulted in a written reprimand (Doc. 22-52 at 1), while the latter triggered a pre-disciplinary conference (Doc. 22-54 at 1), as Assistant Health Care Administrator Kim Henderson found "Nurse Presley ha[d] been negligent with transcribing information onto records that could possibly harm the patients here at [TCI] on several occasions" (Doc. 22-27 at 1). Presley attended a conference in October with her union representative and received a one-day fine that was ultimately reduced to a working suspension (Doc. 22-63 at 1; Doc. 22-69 at 1).

2

**Application for Nurse Supervisor Position**

In August 2013, Burkin stepped down from the Nurse Supervisor position, and nurse Hannah Godsey replaced her temporarily (Doc. 22 at 111–13). Presley questioned why the temporary position was not posted, but her union representative explained only the permanent job would be posted for applicants (*id.* at 113). Presley believed Alice Cain, a former nurse involved in managing the department, wanted Godsey to have the Nurse Supervisor position (*id.* at 115). Presley felt Cain regularly mistreated her, but never reported Cain to supervisors (*id.* at 122).

ODRC posted the permanent position in September, and Presley applied while the pre-disciplinary conference was still pending. Though the two previous Nurse Supervisors were exempt employees, the position was originally posted as a bargaining-unit job (*see id.* at 162; Doc. 24-25 at 1; Doc. 24-26 at 1), which would require the job to go to the applicant with the highest seniority (Doc. 24 at 127). Despite the initial posting, however, ODRC treated the position as exempt from the start. The warden, Edward Sheldon, denied it was a bargaining position (*id.* at 120), and ODRC formed a hiring committee to interview applicants and recommend the best choice (Doc. 24-1 at 2). Moreover, internal ODRC documents produced during the hiring process reflect that the position was exempt (Doc. 22-46 at 1), and Warden Sheldon could not remember any discussion of the position being a bargaining-unit job (Doc. 24 at 124). Neither Presley nor her union representative filed a grievance regarding the apparent confusion over the original posting (Doc. 22 at 207–09).

Presley interviewed for the open position with Warden Sheldon, Cain, Henderson, Deputy Warden Al Chapman, and Quality Improvement Coordinator Jamey Wildman (*id.* at 223–24). No one acted hostile toward her during the interview, and Warden Sheldon told her she performed well (*id.* at 219, 223). But Wildman found her answers lacking in specifics and thought she had a poor attitude

3

based on his floor observations, where Presley frequently used profanity and epithets when speaking of coworkers and management (Doc. 23 at 22–24, 58). Moreover, Warden Sheldon found Presley had a reputation as a "marginal employee [and] average RN" (Doc. 24 at 19–20, 138, 145). The committee recommended Godsey for the permanent position, which she assumed as an exempt employee (Doc. 23 at 25; Doc. 24 at 120).

### Disability Leave and Voluntary Resignation

Shortly after her interview and working suspension in October 2013, Presley filed a charge of discrimination with the Ohio Civil Rights Commission. She complained the job had gone to "a younger white female with less seniority" (Doc. 22-59 at 3). Presley then broke her foot and went on disability leave for five months (Doc. 22 at 275). Henderson contacted Presley during her leave about further training and testing, which Presley viewed as harassment (*id.* at 275–76). Presley returned to work in April 2014, and quickly came under scrutiny again. Wildman, who had recently instituted a quality assurance regimen, noticed ten to fifteen errors by Presley in the weeks after her return (Doc. 23 at 68–69). Presley received training about MARs and processing orders on April 14 (*see* Doc. 22-67), but continued to complain she was being written up for changes made during her time off (*see, e.g.*, Doc. 22-72 at 1).

In June, Presley was interviewed, with her union representative present, about her missing MARs. She claimed she had filled out the MARs and did not know why they were missing. She also disputed ODRC's definition of a "medication error," arguing that missing records were not as serious as patients not receiving their medication (Doc. 22-71 at 4; *see also* Doc. 22 at 286) ("All this is medication error, but it's not a medication error, about the MARs that come up missing. . . . They consider that as a medication error. That is not a medication error.").

4

In July, Presley admitted to mistakenly discontinuing an order for a patient's immunosuppressant drug after confusing it with a dietary supplement (Doc. 22 at 317; Doc. 22-76 at 1). The patient did not receive his medication for a week (Doc. 22 at 317–18), and Presley was reassigned to medical records pending an investigation into her work (*id.* at 302–03). Though she retained the same pay and benefits, Presley found the clerical work humiliating (*id.* at 303–04, 314). Presley testified that at least three white nurses were put on administrative leave pending investigation and not reassigned to medical records (*id.* at 311). Presley resigned from ODRC on July 28, 2014 (*id.* at 320). On the separation form, Presley simply listed "medical" as the reason for her resignation (Doc. 22-78 at 1).

### STANDARD OF REVIEW

Summary judgment is appropriate if there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Federal Civil Rule 56(a). When considering a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It may not weigh the evidence or make credibility judgments. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). But "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Expert Masonry, Inc. v. Boone Cty, Ky.*, 440 F.3d 336, 341 (6th Cir. 2006) (internal quotation marks omitted).

### DISCUSSION

ODRC contends it is entitled to judgment on Presley's claims of race and sex discrimination. As Presley fails to provide direct evidence of either race or sex discrimination, her claims are evaluated

under the familiar *McDonnell Douglas* framework. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). Accordingly, Presley must first establish a *prima facie* case of discrimination. Should she do so, ODRC then must put forth a "legitimate, nondiscriminatory reason" for the employment decision. If ODRC meets its burden, the ball is back in Presley's court to show the proffered reason is a mere pretext for the discrimination. *Id.* at 706–07.

The elements of a *prima facie* case are essentially the same for each of Presley's claims. Presley must show: (1) "she was a member of a protected class;" (2) "she suffered an adverse employment action;" (3) "she was qualified for the position;" and (4) "she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

**Race Discrimination Claims**

Presley advances three distinct claims of racial discrimination. She argues ODRC discriminated against her by: (1) awarding the Nurse Supervisor position to Godsey; (2) disciplining her more harshly than her white coworkers; and (3) reassigning her to a clerical position pending investigation, which she alleges amounted to a constructive discharge (Doc. 1 at 5–7).

*Failure to Promote*. ODRC does not seriously contest Presley's *prima facie* case, choosing instead to argue that she cannot show ODRC's reason for hiring Godsey was pretextual: the hiring committee unanimously felt Godsey was better qualified for the position (Doc. 24 at 27). Warden Sheldon, who oversaw the hiring process and sat in on all interviews, thought Presley interviewed well but described his understanding of her as a "marginal employee [and] average RN" (*id.* at 19–20, 138, 145). Wildman found her answers lacking in specifics and thought her poor attitude made her unfit for a supervisory role (Doc. 23 at 22–24, 58).

6

Presley compares her qualifications to Godsey's and argues ODRC could not have honestly believed Godsey was a better candidate. She does this in two ways, neither persuasive. First, she attempts to minimize her documented history of medication errors by arguing either she was not to blame (Doc. 31 at 4–5), or by disputing ODRC's definition of what constitutes a medication error (*see, e.g.*, Doc. 22 at 286). Second, she attacks Godsey's qualifications by arguing that, in her deposition, Godsey admitted to making errors and could not explain what constitutes a medication error (Doc. 31 at 5–6). But critically, Presley fails to direct this Court to any evidence that ODRC knew of Godsey's supposed litany of errors or lack of awareness beyond Presley's own broad assertions that ODRC went easier on Godsey than it did on her. As Presley recognizes, Godsey's disciplinary log showed only one disciplinary action over the two years prior to her appointment as Nurse Supervisor (*see id.* at 7; Doc. 26-5 at 1). By contrast, Presley was under investigation pending a pre-disciplinary hearing at the time she applied for the position.

The Sixth Circuit handles this kind of "qualifications" argument in one of two ways. "In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626–27 (6th Cir. 2006). But where there is "little or no other probative evidence of discrimination, . . . the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Id.* at 627.

Presley argues two irregularities in the selection process constitute "other probative evidence of discrimination." She first points to affidavits by former coworkers in which they recount labor

7

relations officer Tara Pinski saying Godsey would be Burkin's replacement (Doc. 31-2 at ¶ 6; Doc. 31-3 at ¶ 9). This comment was allegedly made at least a month before Godsey's selection as interim Nurse Supervisor. Based on this secondhand comment, she argues, "a jury could readily find that the formal selection process was nothing but a show" (Doc. 31 at 17). Not so. As ODRC argues, Presley's coworkers profess no personal knowledge of the decision-making process. Further, Presley fails to direct this Court to any evidence that Pinski had any role in the hiring decision.

Presley next highlights that the Nurse Supervisor position was originally posted as a bargaining-unit position -- for which the only measure, seniority, would have favored her -- and switched to an exempt position only after she applied. This, she says, shows ODRC targeted her personally. There are three problems with this argument. First, Presley offers nothing more than her own speculation to support her theory. True, she floats a plausible reason why ODRC *might* have offered the Nurse Supervisor role as a bargaining-unit position: it had been unable to retain anyone in the position and may have wanted to provide the new replacement added security (*see* Doc. 22 at 162–63). But the record shows that all parties involved acted as if the position was exempt, including Warden Sheldon (*see* Doc. 24 at 120). And as ODRC points out (Doc. 33 at 7), its decision to task a hiring committee with conducting a series of interviews and recommending the most qualified applicant is inconsistent with posting the job as a bargaining-unit position. Further, internal ODRC documents reflect that the position was exempt (*see, e.g.*, 22-46 at 1). All of this is further informed by the fact that the position was exempt when held by Godsey's two predecessors, and that Godsey was exempt when she took over the position permanently (Doc. 24-25 at 1; Doc. 24-26 at 1).

Second, Presley's theory cannot be squared with her own argument that Godsey was pre-selected to take over the position. Were Presley correct, the powers that be would have no reason to

offer the position as a bargaining-unit job, as ODRC knew it would have to award the job to Presley as the most senior nurse (*see* Doc. 22-19 at 1).

Third, Presley's theory, even if correct, does little to advance her cause. ODRC has shown Presley had a checkered record as a nurse and was perceived to have a poor attitude, unbefitting a leadership role. Even if it switched the position from bargaining to exempt after Presley applied, Presley still must marshal evidence suggesting ODRC did so because of her *race*. She has not.

Presley, at best, shows she *could* have been chosen for the position. But the law requires more. "[E]vidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual." *Bender*, 455 F.3d at 627.

***Disparate Discipline***. Presley next claims ODRC disciplined her more frequently because of her race. ODRC argues Presley fails to meet the second and fourth elements of her *prima facie* case.

It first argues "her counseling(s) and written reprimands do not constitute an adverse employment action," while noting that even her one-day suspension resulted in no loss of pay (Doc. 25 at 16). The Sixth Circuit has routinely held that "[a] written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action." *Creggett v. Jefferson Cty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012); *see also Lahar v. Oakland Cty.*, 304 F. App'x 354, 357 (6th Cir. 2008); *Jones v. Butler Metro. Hous. Auth.*, 40 F. App'x 131, 137 (6th Cir. 2002).

Presley resists by arguing ODRC's reprimands carry extra weight because it uses a progressive discipline policy. She contends "it was the cumulative sum of the purported errors that led to her transfer" to medical records (Doc. 31 at 20). But Presley's proposed rule -- that any reprimand issued

9

as part of a progressive discipline policy is itself a materially adverse employment action -- would gut the adverse-action element of any meaning. To the extent these cumulative errors led to Presley's transfer, they are subsumed by that claim.

ODRC next maintains Presley cannot show she was treated differently than a similarly situated employee, as "Presley cannot identify a coworker with her extensive workplace problems who also require individual trainings to follow the most basic rules in her workplace" (Doc. 25 at 16). Presley again relies on alleged errors by Godsey that went unpunished (Doc. 31 at 20). But as discussed, Presley fails to present any meaningful evidence ODRC supervisors were aware of any supposed errors beyond those reflected in her disciplinary log. Moreover, at least one white nurse was terminated after just one medication error, a more serious measure than anything imposed on Presley (Doc. 22 at 334; Doc. 25-1 at 13–14).

In any event, Presley fails to show ODRC's reason for disciplining her -- she made medication errors -- was a pretext for racial discrimination. She argues, again, that Godsey's errors were so severe ODRC "could not honestly believe Presley deserved more serious discipline than the non-discipline of Godsey" (Doc. 25 at 21). Aside from Presley's inability to show management knew of most of Godsey's "unpunished errors," the comparison has no bearing on ODRC's charge that Presley, in fact, committed medication errors. Indeed, Presley simply disagrees with ODRC's definition of a medication error (*see, e.g.*, Doc. 22 at 286). That is not enough to show pretext. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584–85 (6th Cir. 1992).

***Reassignment and Constructive Discharge***. The Complaint lists Presley's reassignment to records and her constructive discharge as separate counts (*see* Doc. 1 at 6–7), but the record and Presley's brief demonstrate these claims rise and fall together (*see* Doc. 31 at 23–24) (identifying the

reassignment as the event constituting constructive discharge). Because Presley maintained the same salary and benefits after her reassignment, the reassignment qualifies as an adverse employment action only "if the conditions of the transfer would have been objectively intolerable to a reasonable person, thereby amounting to a 'constructive discharge.'" *Strouss v. Mich. Dep't of Corrections*, 250 F.3d 336, 343 (6th Cir. 2001); *see also Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) ("[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."). But showing intolerable conditions is not enough; Presley must also show ODRC created the conditions with the intention of forcing her to quit. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001).

The Sixth Circuit has outlined seven factors a court should consider in ascertaining whether working conditions were objectively intolerable: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Id.* at 569.

Presley maintains her reassignment to records resulted in "a reduction in job responsibilities, reassignment to menial or degrading work, and to humiliation in the form of former coworkers asking her why she could no longer practice her nursing" (Doc. 31 at 23–24). But as ODRC contends, a temporary reassignment away from patient care pending an investigation into a nurse's medication errors is hardly objectively intolerable. *See White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) ("A mere inconvenience or an alteration of job responsibilities or a bruised ego is not enough to constitute an adverse employment action." (internal quotation marks omitted)). And

more importantly, Presley offers no evidence permitting an inference either that ODRC intended to force her to quit, or that its legitimate, non-discriminatory reason for reassigning her -- that she posed a danger to patients (*see* Doc. 23 at 70–71) -- was mere pretext for racial discrimination.

**Sex Discrimination Claim**

Presley next claims she was unfairly punished on account of her sex. The sole basis for this claim is the treatment of a male nurse, Michael Mathews, who was twice found sleeping on the job (*see* Doc. 31 at 24), but only written up once (Doc. 26 at 57–59). To show she was similarly situated to Mathews, however, Presley must demonstrate they "engaged in the *same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583 (emphasis added). Mathews' misconduct differs in kind from Presley mishandling medical records and patient medication. Her allegation that Mathews was not disciplined for misconduct that "she subjectively believes to be more serious . . . simply does not satisfy th[e similarly situated] element." *Mitchell*, 964 F.2d at 583. For the same reason, ODRC's treatment of Mathews in no way suggests its decision to discipline Presley for frequent medication errors was somehow a pretext for sex discrimination. *See, e.g.*, *Braithwaite v. Timken Co.*, 258 F.3d 488, 497 (6th Cir. 2001).

## CONCLUSION

Presley had a turbulent tenure at ODRC; but the facts, construed in her favor, simply do not permit any reasonable inference that Presley's race or sex was the cause of her troubles. The Motion for Summary Judgment (Doc. 25) is granted.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

April 27, 2016

12